# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

MONARCH AIR GROUP, LLC d/b/a
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

      Plaintiff,

vs.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.

_____/

Case No.

## COMPLAINT

Plaintiffs, MONARCH AIR GROUP, LLC ("Monarch"), a Florida limited liability company, and DAVID GITMAN, an individual ("Gitman") (collectively, "Plaintiffs"), by and through the undersigned counsel, hereby file this Complaint against Defendant, JPMORGAN CHASE BANK, N.A. ("Chase" or "Defendant"), a foreign profit corporation.

### JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction under 28 U.S.C. §1332, as the Plaintiffs are citizens of the State of Florida, and the Defendant is a foreign corporation, and the amount in controversy exceeds $75,000.00, exclusive of interest, attorney's fees, and costs.

2. Venue is proper in the Southern District Court of Florida, Fort Lauderdale Division under 28 U.S.C. § 1446(a) as the District where the Plaintiffs reside or do business and where the cause of action arose.

3. Plaintiff, MONARCH AIR GROUP, LLC, d/b/a MERCURY JETS, is a Florida limited liability company with its principal place of business in Broward County, Florida, and is a Florida citizen.

4. Plaintiff, DAVID GITMAN, is a sui juris individual doing business in Broward County, Florida, and is a citizen of Florida.

5. Defendant, JPMORGAN CHASE BANK, N.A., is a citizen of Ohio.

6. All conditions precedent to the institution, maintenance, and prosecution of this lawsuit have been performed, excused, waived, or have otherwise occurred.

**GENERAL ALLEGATIONS**

7. Monarch is in the business of (a) providing on-demand, private aircraft charter services in Florida and across the globe; (b) providing aircraft management services to aircraft and fleet owners; (c) providing mission critical supplies to United States and non-governmental entities throughout the world; (d) providing aircraft acquisition and management services; and (e) providing specialized aviation solutions.

8. Accordingly, Monarch transacts business with customers throughout the United States and the world.

9. Monarch owns and controls several bank accounts for the purposes of transacting business with its customers. Gitman is a principal of Monarch and also owns and controls bank accounts for purposes of transacting business and paying non-commercial expenses, like paying his family's home mortgage, through wire payment orders. Monarch accepts payments from its customers via wire payment orders in exchange for Monarch's services.

10. Chase is one of the largest consumer banks in the world with over 5,100 branches in the United States alone.

11. Monarch and Gitman held and owned bank accounts at Chase until Chase unilaterally closed their accounts in the end of 2019.

12. Many of Monarch's customers hold, own bank accounts at, and conduct their consumer banking affairs with Chase. Many of the individuals and businesses to who Gitman must

process payments also own bank accounts and conduct their consumer banking affairs with Chase, including his family's home mortgage.

13. In or around July 2020, Chase placed Plaintiffs on their internal interdiction list and began unreasonably cancelling wire payment orders placed by their customers or to their mortgagee who had contractual relationships with Chase to fulfill such payment orders to or from the Plaintiffs. The Plaintiffs are the intended third-party beneficiaries of Chase's contractual duty to carry out these wire payment orders to or from Plaintiffs.

14. Plaintiffs repeatedly contacted Chase to ascertain the reason(s) behind Chase's repeated rejections of the wire payment orders to or from the Plaintiffs.

15. Notwithstanding Plaintiffs' repeated inquiries, Chase failed to provide a cognizable rationale for its repeated rejections.

16. It was ultimately unearthed that Chase placed Plaintiffs on their interdiction list because, after Gitman acquired and built Monarch's private jet brokering business, the Plaintiffs were targeted in 2019 by a sensationalist political blog because Monarch's previous owners were convicted of crimes well after they cut all ties with Monarch ("Blog Post").

17. The author of the Blog Post recanted the contents of the Blog Post, removed the Blog Post, admitted he had no evidence for the accusations made and that the Blog Post is false, and apologized. Nevertheless, based on this unverified Blog Post, Chase put Plaintiffs on their interdiction list and cancelled wire payment orders to and from the Plaintiffs.

18. Chase's interdiction list is managed by its GFIU department. As the reason for the GFIU's rubber-stamped request to place Plaintiffs on the interdiction list and then cancel wire payment orders, the only disclosable grounds for same was the Blog Post.

19.     But rather than just use the anyways false and unsupported content of the Blog Post, the GFIU came up with entirely new lies about the Plaintiffs.  In particular, the GFIU falsely made up (i) that monies Monarch sent between entities could have been involved in potential interference with the 2016 US Presidential Election and (ii) that during a trial of non-parties, a US judge stated that in addition to their legitimate activities as airline companies, that Monarch was also used as a front for the Russian Mafia to launder money and traffic drugs.

20.     This outlandish election-interference accusation was even too much for the political Blog Post to include, yet Chase's GFIU conjured up and then relied upon this false accusation and maintained that it was the Blog Post who identified Monarch as the subject of these accusations. The Blog Post contains no such allegations.

21.     Nor did Chase do anything to corroborate or verify the actual content of the Blog Post, which fallaciously claimed that a judge said Monarch is a Russian Mafia front.  Chase's own guidelines require that there be a corroborated open-source negative media (e.g. U.S. Dept. of Justice indictment or plea deal agreement) that includes allegations of money laundering, terrorist financing, corruption, or embezzlement for the individual or entity in question.

22.     Had Chase done even a modicum of corroboration, Chase would have discovered that no judge said anything of the sort. Rather, the Blog Post was merely misquoting an attorney who made that accusation during his argument to the judge about when Monarch was owned by another individual in 2009-2011 and which attorney, also, made clear back in 2013 that he was wrong in his comments and fell on his sword. The author of the Blog Post concedes that it would have taken someone, including Chase, a few moments to confirm the falsity of the allegations made in the Blog Post.

23. Nonetheless, 7 years later, despite having no support or verification of anything in the Blog Post or the ensuing GFIU request, Chase placed Plaintiffs on its interdiction list and began to cancel confirmed wire payment orders to or from Plaintiffs.  While Chase maintains that it does not and cannot reevaluate Plaintiffs' placement on the interdiction list and ongoing cancellations of wire payment orders, Chase has done so for large client actually engaging in unlawful activity facilitated through wire transfers and cash payments through their Chase accounts.

24. Plaintiffs have retained the undersigned attorneys to prosecute this lawsuit on their behalf and are required to pay said attorneys a reasonable fee for their services.

## Count I
### CHASE'S BREACH OF CONTRACT IN VIOLATION OF THE UCC

25. Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 24 as if fully set forth herein.

26. Chase entered into binding contractual relationships with the senders and recipients of the wires to and from Plaintiffs, the terms of which are administered, in part, by Florida's Uniform Commercial Code.

27. Plaintiffs are intended third party beneficiaries of these contractual relationships and the UCC provisions governing same.

28. Florida adopted portions of the UCC to predict risk with certainty involving these contractual relationships, to insure said risk with certainty, to adjust operational and security procedures, and to price funds transfer services appropriately.

29. Article 4A governs "funds transfers" including the wire payment orders cancelled by Chase to or from the Plaintiffs. Fla. Stat. § 670.102.

30. A "funds transfer" occurs when a bank customer instructs her bank—also known as a "receiving bank" because the bank *receives* the instruction—to send money to a second person's bank account. Fla. Stat. § 670.104.

31. The second bank is the "beneficiary's bank," and this direction is called a "payment order." Fla. Stat. §§ 670.103, 670.104.

32. When a receiving bank—really, the paying bank—receives a payment order, it is obligated to honor the payment order unless commercially reasonable and good faith security procedures and grounds exist to cancel same. Fla. Stat. § 670.302.

33. Chase failed to establish and maintain an commercially reasonable and good faith anti-money laundering compliance program as it relates to the GFIU's placement of Plaintiffs on their interdiction list and cancelling the wire payment orders thereafter.

34. Rather, the GFIU placed Plaintiffs on their interdiction list based on an uncorroborated Blog Post, which contained easily falsifiable information from almost a decade earlier.

35. Worse still, rather than simply rely on this false and outdated information regarding Monarch's business operations, the GFIU made up entirely new false things to report as its reason for placing Plaintiffs on its interdiction list, such as election interference.

36. Because Chase failed to establish or maintain commercially reasonable and good faith procedures in initially placing Plaintiffs on its interdiction list – and because Chase failed to perform a commercially reasonable and good faith independent investigation of the particular wire payment orders cancelled thereafter, and simply relied on its previous deficient placement of Plaintiffs on the interdiction list – Plaintiffs suffered damages.

**WHEREFORE**, based on the foregoing, Plaintiffs respectfully demand judgment against Defendant, JP MORGAN CHASE BANK, N.A. for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) punitive damages; (e) injunctive relief ordering Chase to honor wire payment orders to or from Plaintiffs until an independent, commercially reasonable and good faith determination is made regarding the particular wire payment order in question; and (f) any other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: April 26, 2023.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
*Attorneys for Plaintiffs*
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

BY:*/s/Robert A. Stok*
ROBERT A. STOK, ESQ.
Florida Bar No. 857051
(rstok@stoklaw.com)
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)